1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT
9          SOUTHERN DISTRICT OF CALIFORNIA
10

11   ALEXANDRA C.,                          Case No.:  19cv0756-RBB
12                          Plaintiff,
                                            **ORDER DENYING PLAINTIFF'S**
13   v.                                     **MOTION FOR SUMMARY**
                                            **JUDGMENT, REVERSAL OR**
14   ANDREW M. SAUL, Commissioner of        **REMAND [ECF NOS. 10, 11] AND**
     Social Security,                       **GRANTING DEFENDANT'S CROSS-**
15                                          **MOTION FOR SUMMARY**
16                          Defendant.      **JUDGMENT [ECF NO. 17]**
17

18          On April 24, 2019, Plaintiff Alexandra C.[1] commenced this action against

19   Defendant Andrew M. Saul, Commissioner of Social Security, for judicial review under

20   42 U.S.C. § 405(g) of a final adverse decision for social security benefits [ECF No. 1].

21   Defendant filed the Administrative Record on June 28, 2019 [ECF No. 8].  On August 2,

22   2019, Plaintiff filed a motion for summary judgment, reversal or remand [ECF Nos. 10,

23   11].  The Commissioner filed a cross-motion for summary judgment and an opposition to

24

25   _____

26   [1] The Court refers to Plaintiff using only her first name and last initial pursuant to the Court's Civil Local
27   Rules.  See S.D. Cal. Civ. R. 7.1(e)(6)(b).

                                              1
28

Plaintiff's motion on November 5, 2019 [ECF No. 17].  Plaintiff filed an opposition to Defendant's cross-motion and a reply on November 20, 2019 [ECF Nos. 19, 20].

For the following reasons, Plaintiff's motion for summary judgment, reversal or remand is **DENIED** and Defendant's cross-motion for summary judgment is **GRANTED**.

## I.      BACKGROUND

On August 31, 2015, Plaintiff protectively filed an application for disability insurance benefits under Title II of the Social Security Act.  (Admin. R. 21, 140-41, ECF No. 8.) [2]  Plaintiff alleged that she has been disabled since November 14, 2014, due to a back injury, rheumatoid arthritis, and osteoarthritis.  (Id. at 140, 164.)  Plaintiff was born in 1961 and previously worked as a hostess at the Hotel Del Coronado and as a secretary for an importing and exporting business.  (Id. at 160, 165.)  Her application was denied on initial review and again on reconsideration.  (Id. at 71-74, 84-88.)  An administrative hearing was conducted on March 22, 2018, by Administrative Law Judge ("ALJ") Howard K. Treblin, who determined on April 25, 2018, that Plaintiff was not disabled. (Id. at 21-30.)  Plaintiff requested a review of the ALJ's decision; the Appeals Council for the Social Security Administration ("SSA") denied the request for review on March 29, 2019.  (Id. at 1-3.)  Plaintiff then commenced this action pursuant to 42 U.S.C. § 405(g).

A.    **Medical Evidence**

On July 8, 2013, Alexandra C. was evaluated by neurosurgeon David D. Barba, M.D., who had performed a lumbar laminectomy surgery on Plaintiff in March 2007. (Id. at 219-20, 222.)  Plaintiff told Dr. Barba that she had experienced pain relief for three

---

[2] The administrative record is filed on the Court's docket as multiple attachments.  The Court will cite to the administrative record using the page references contained on the original document rather than the page numbers designated by the Court's case management/electronic case filing system ("CM/ECF"). For all other documents, the Court cites to the page numbers affixed by CM/ECF.

years following her surgery, but her low back pain had progressively increased over the prior three years.  (Id. at 222.)  Dr. Barba noted that an MRI scan of Plaintiff's lumbar spine showed diffuse degenerative changes with an otherwise normal alignment, and her neurologic examination was normal.  (Id.)  Plaintiff advised that she was interested in obtaining disability benefits.  (Id.)  Dr. Barba recommended that Alexandra C. start physical therapy.  (Id.)

The following month, on August 12, 2013, Plaintiff returned to Dr. Barba's office and complained of bilateral shoulder pain as well as low back and leg pain.  (Id. at 224.)  She stated that she had not gone to physical therapy because of extra costs required by her insurance company.  (Id.)  Dr. Barba recommended against surgical intervention.  (Id.)  On February 6, 2014, Alexandra C. reported continued low back pain and more recent pain in her left thigh and calf.  (Id. at 237.)  Dr. Barba ordered an electromyography (EMG) test of her left leg and a repeat MRI scan of her lumbar spine.  (Id. at 238.)

On July 7, 2014, Dr. Barba informed Plaintiff that her low back and leg pain were related to degenerative changes in her lumbar spine.  (Id. at 245.)  Specifically, her lumbar MRI showed degenerative disc disease with stenosis[3] at L2-3 and degenerative changes including anterolisthesis[4] at L3-4 and L4-5.  (Id.)  The EMG of Plaintiff's left leg showed chronic axonal loss affecting the L5 myotome, most likely due to chronic

---

[3] Spinal stenosis is the narrowing of the spaces within the spine, which can put pressure on the nerves that travel through the spine.  See Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/spinal-stenosis/symptoms-causes/syc-20352961 (last visited Apr. 9, 2020).

[4] Anterolisthesis is when an upper vertebral body slips forward on the vertebral body below it.  The amount of slippage is graded on a scale from 1 to 4.  Grade 1 is mild (20% slippage), while grade 4 is severe (100% slippage).  See Cedars Sinai, https://www.cedars-sinai.edu/Patients/Health-Conditions/Anterolisthesis.aspx (last visited Apr. 9, 2020).

1    radiculopathy.[5]  (Id. at 241.)  Dr.  Barba strongly recommended that Alexandra C.

2    proceed with physical therapy and ride an exercise bike to reduce her low back pain.  (Id.

3    at 245.)  The doctor also noted that Plaintiff exhibited signs and symptoms consistent

4    with shoulder impingement and advised her to seek an orthopedic consultation.  (Id.)

5         Plaintiff saw her regular primary care physician, Anselmo Roldan, M.D. of the

6    Borrero Medical Group, on August 28, 2014, for rheumatoid arthritis, spinal stenosis,

7    chronic back and leg pain, and shoulder pain.  (Id. at 356-57.)  The physician noted that

8    Plaintiff was "moderately obese."  (Id. at 357.)  Dr. Roldan advised Alexandra C. to

9    continue her medication regimen, which included a caffeine tablet for headaches, Lipitor

10   for cholesterol, pseudoephedrine for congestion, Losartan and hydrochlorothiazide for

11   hypertension, and ibuprofen.  (Id. at 356-57.)

12        On September 24, 2014, Plaintiff received a rheumatology consultation from the

13   San Diego Arthritis Clinic.  (Id. at 379-81.)  Dr. Soumya Rao noted that although

14   Alexandra C.'s blood tests demonstrated elevated rheumatoid factor and positive dsDNA,

15   she did not have any complaints suggestive of an inflammatory joint disease, lupus, or

16   mixed connective tissue disease.  (Id. at 381.)  Dr. Rao rated Plaintiff's arthritic disease

17   activity as a three on a scale of ten and indicated that Plaintiff did not have any

18   limitations in her functional capacity.  (Id.)  X-rays of Plaintiff's hands showed mild

19   osteoarthritis of the fourth and fifth fingers bilaterally and osteoarthritis of the bilateral

20   third through fifth toes.  (Id. at 349-50.)  On October 23, 2014, Dr. Rao opined that

21

22

23

24

25   [5] "Radiculopathy" describes a range of symptoms produced by the pinching of a nerve root in the spinal column which may cause pain, weakness, numbness, and tingling.  See Johns Hopkins,

26   https://www.hopkinsmedicine.org/health/conditions-and-diseases/radiculopathy (last visited Apr. 9, 2020).

27

28
                                                                            19cv0756-RBB

Plaintiff had early arthralgia[6] and prescribed hydroxychloroquine to be taken twice per day.  (Id. at 385.)  When Alexandra C. returned to Dr. Rao on December 8, 2014, she complained of continued shoulder pain as well as knee pain when walking.  (Id. at 290.)  He advised Plaintiff to continue taking hydroxychloroquine and ordered x-rays and an ultrasound of her left knee and left shoulder.  (Id. at 292.)  A few weeks later, on December 22, 2014, Alexandra C. received a steroid injection in her left shoulder.  (Id. at 293-94.)

On January 7, 2015, Plaintiff saw Dr. Roldan, her primary care physician, to request that he complete paperwork on her behalf.  (Id. at 338.)  Dr. Roldan indicated that Plaintiff was "completely disabled" until July 7, 2015.  (Id. at 339.)  Soon thereafter, on January 26, 2015, Alexandra C. informed Timothy Lazarek, an N.P. at Dr. Rao's office, that the steroid injection had resolved her left shoulder pain.  (Id. at 295.)  She also reported that hydroxychloroquine was effective and was not causing any adverse side effects.  (Id.)  Her neurologic exam was "grossly normal," (id. at 296), and her joint exam results were normal with no synovitis, swelling, or tenderness, (id. at 297).  When Plaintiff returned to Dr. Rao's office three months later, on April 20, 2015, her shoulder pain had returned.  (Id. at 298.)  Plaintiff next saw Basma Al Nahlawi, M.D. of San Diego Arthritis Clinic, on July 9, 2015.  (Id. at 287.)  Dr. Al Nahlawi ordered additional blood tests, shoulder x-rays to evaluate Plaintiff for calcified tendinitis, physical therapy for Plaintiff's shoulders, and a left knee x-ray.  (Id. at 289.)

Physical therapist Trevor D'Souza evaluated Alexandra C. on July 28, 2015.  (Id. at 254-57.)  Plaintiff told him that she attended one-hour aquatic exercise classes at LA Fitness three times a week.  (Id. at 255.)  Her primary complaint was of left shoulder pain

[6] Arthralgia is defined as aching or pain in the joints without swelling.  See Healthline, https://www.healthline.com/health/rheumatoid-arthritis/arthralgia#distinctions (last visited Apr. 9, 2020).

19cv0756-RBB

which was aggravated by sleeping on her left side or holding her arm in an elevated position.  (Id.)  Plaintiff's abilities to wash and style her hair and to clean overhead were limited due to pain.  (Id.)  She also had secondary complaints of bilateral knee pain, with greater discomfort on the left than right; low back pain; right shoulder pain; and right hip pain.  (Id.)  The physical therapist observed that Alexandra C. had decreased range of motion and impaired movement synergies in her left shoulder.  (Id. at 256.)  He prepared a treatment plan for physical therapy to be provided twice a week for eight to twelve weeks.  (Id. at 256-57.)  X-rays taken of Plaintiff's left knee on August 17, 2015, were normal.  (Id. at 310.)  Shoulder x-rays showed calcification in the right shoulder.  (Id. at 311.)  On September 9, 2015, Dr. Al Nahlawi noted that Plaintiff continued to show no sign of active rheumatoid arthritis.  (Id. at 253.)

On October 26, 2015, state agency medical consultant E. Steinsapir, M.D., reviewed Plaintiff's case and assessed her physical residual functional capacity.  (Id. at 54-55.)  The doctor opined that Alexandra C. could lift and carry fifty pounds occasionally and twenty-five pounds frequently, stand and/or walk for six hours in an eight-hour day, sit for six hours in an eight-hour day, and was unlimited in her ability to push and/or pull.  (Id. at 54.)  Dr. Steinsapir observed that Plaintiff's rheumatoid arthritis diagnosis was based on lab tests only and there was no active disease on examination, and that evaluations of her age-related osteoarthritis yielded benign results.  (Id.)

During an office visit on November 4, 2015, Dr. Roldan, Alexandra C.'s primary care doctor, noted that Plaintiff was able to bathe herself, clean the house, converse meaningfully, cook, dress herself, drive, and live independently.  (Id. at 308-09.)  On March 15, 2016, Dr. Roldan prescribed Tramadol Hcl, a pain medication, to be taken three times a day.  (Id. at 547.)  He indicated that Plaintiff's status was "completely disabled and decline expected," but did not specify the reason.  (Id.)  On April 25, 2016, state agency consultant Deborah Wafer, M.D., agreed with the previous assessment of

1    Plaintiff's residual functional capacity offered by state agency physician Dr. Steinsapir.

2    (Id. at 66-67.)

3        In his April 27, 2016 treatment notes, Dr. Roldan indicated that Alexandra C. had

4    persistent joint pain in her knees and fingers, and low back pain.  (Id. at 533-34.)  On

5    May 17, 2016, Plaintiff returned to her rheumatologist, Dr. Al Nahlawi.  (Id. at 445-47.)

6    On her musculoskeletal exam, Plaintiff exhibited no tenderness or synovitis and had

7    normal movement of all extremities.  (Id. at 446.)  The doctor ordered lab work to further

8    evaluate her rheumatoid arthritis, requested bilateral cervical x-rays to assess her

9    osteoarthritis, and recommended cortisone injections for calcific tendinitis in both of

10   Plaintiff's shoulders.  (Id. at 446-47.)  Alexandra C.'s cervical x-rays showed severe

11   spondylosis[7] and severe disc height narrowing at C4-5, C5-6, and C6-7 and facet

12   arthrosis at C6-7 and C7-T1.  (Id. at 421.)  Dr. Mahmood Pazirandeh took over as

13   Plaintiff's rheumatologist when she returned to the arthritis clinic on June 24, 2016.  (Id.

14   at 441.)  The doctor ordered lab work, MRIs of the shoulders and lumbar spine, and a

15   chest x-ray, and instructed Alexandra C. on shoulder exercises to help her symptoms.

16   (Id. at 443.)  The lumbar spine MRI, which was performed on August 8, 2016, showed

17   severe facet arthritis and severe spinal stenosis.  (Id. at 405, 407-08.)  Dr. Pazirandeh

18   referred Plaintiff to physical therapy for her back and advised her to continue taking

19   Mobic (also known as Meloxicam, a nonsteroidal anti-inflammatory drug) and

20   hydroxychloroquine.  (Id. at 405-06.)  On August 23, 2016, however, Plaintiff

21   complained that hydroxychloroquine was not helping her pain, which she rated as eight

22   out of ten.  (Id. at 402.)  Dr. Pazirandeh noted that despite the spinal stenosis and

23   degenerative disc disease in her cervical spine, Plaintiff had normal range of motion in all

24

25

26   [7] Cervical spondylosis is age-related wear and tear affecting the spinal discs in the neck.  See Mayo
     Clinic, https://www.mayoclinic.org/diseases-conditions/cervical-spondylosis/symptoms-causes/syc-
27   20370787 (last visited Apr. 9, 2020).

                                                    7

28

joints, normal low back flexion, and a normal neurological exam.  (Id.)  The doctor also doubted that Alexandra C. had rheumatoid arthritis and provided an alternate diagnosis of undifferentiated inflammatory arthritis.  (Id.)  Dr. Roldan, Plaintiff's primary care physician, also observed that Plaintiff had full range of motion in her neck without pain during his examination on August 24, 2016.  (Id. at 520-21.)

Plaintiff started physical therapy at South Bay Orthopaedic Physical Therapy on September 9, 2016.  (Id. at 472.)  She reported that she was in constant pain, was limited in her ability to perform household tasks, and could only stand for ten minutes.  (Id.)  Her pain increased after she vacuumed and mopped, and her pain level ranged between two and eight on a scale of ten.  (Id.)  Alexandra C. attended twelve therapy appointments between September 9 and November 2, 2016.  (Id. at 448, 477-99.)  At her final appointment, Plaintiff reported that she had not had any pain in a week and her pain level was between zero and two.  (Id. at 497.)  She also advised that in addition to doing water aerobics twice a week, she was walking on the treadmill and using the stationary bike at the gym for thirty minutes, three to four times per week.  (Id.)  Due to her improvements with physical therapy, Plaintiff reported that she was able to stand for twenty minutes without requiring a sitting rest and was able to vacuum and mop one room without pain. (Id. at 499.)  Plaintiff was deemed to be an excellent candidate for discharge to a home exercise program and was noted to have a good understanding of the recommended exercises.  (Id.)

Alexandra C. next followed-up with Dr. Pazirandeh, the rheumatologist, on December 8, 2016.  (Id. at 425.)  She complained of left shoulder pain and elected to proceed with a kenalog injection of her shoulder.  (Id. at 425-26.)  The following week, she presented with right shoulder pain and received a kenalog injection of that shoulder. (Id. at 427-28.)  On January 19, 2017, an MRI of Plaintiff's left shoulder showed acromial arch impingement morphology.  (Id. at 506-07, 510.)  When Plaintiff next saw

8

Dr. Roldan, her primary care doctor, on March 10, 2017, she reported pain in both shoulders.  (Id. at 504.)  Dr. Roldan referred her to Dr. Eves, an orthopedic surgeon.  (Id. at 505.)

That same day, on March 10, 2017, Plaintiff received an assessment from Swapna Busa, M.D., a rheumatologist referred by Dr. Roldan.  (Id. at 431-34.)  Plaintiff reported that neither hydroxychloroquine nor Meloxicam, also known as Mobic, helped her arthritis.  (Id. at 431.)  Her pressing issue was her left shoulder pain, for which she said the recent injection had provided no relief.  (Id.)  Dr. Busa found no evidence of active rheumatoid arthritis.  (Id.)  An examination of Alexandra C.'s joints showed no synovitis and all joints had full range of motion, other than her left shoulder.  (Id. at 434.)  The physician referred Plaintiff to physical medicine for her chronic neck and low back pain.  (Id. at 431.)  A few weeks later, on March 31, 2017, Alexandra C. reported that the previous injection in her right shoulder had helped for three months but that she had recently noticed pain in that shoulder as well, so Dr. Busa administered another injection.  (Id. at 557.)  Plaintiff added Tramadol to help with pain relief, discontinued Meloxicam, and planned to schedule physical therapy.  (Id. at 558.)

On May 1, 2017, Plaintiff consulted with Patricia Lutfy, M.D. at Synovation Medical Group Chula Vista, for evaluation and management of chronic generalized body pain.  (Id. at 615-20.)  Alexandra C. stated that her most severe pain was in her back and that it radiated to both lower extremities.  (Id. at 615.)  Dr. Lutfy performed a physical examination and reviewed Plaintiff's MRI scans and x-rays.  (Id. at 616-19.)  She prescribed physical therapy, a lumbar epidural steroid injection at L4-5, orthopedic evaluation of the left shoulder, myofascial treatments, a sample of Pennsaid (a topical solution) for the left shoulder, exercise, and postural corrections.  (Id. at 619-20; see also id. at 569.)  Plaintiff next obtained an orthopedic evaluation from Dr. William C. Eves on May 5, 2017.  (Id. at 601-03.)  Dr. Eves found evidence of impingement syndrome of

19cv0756-RBB

both shoulders with an underlying glenoid labral tear of the left shoulder.  (Id. at 602.)
Dr. Eves discussed various treatment options; Plaintiff opted to proceed with physical
therapy and activity modification.  (Id.)

On May 12, 2017, Plaintiff returned to her new rheumatologist's office and was
seen by Mary Anne Joy Romero, N.P.  (Id. at 554-56.)  Plaintiff denied any recent
arthritic flares and showed no active synovitis.  (Id. at 554.)  She reported the steroid
injection to her right shoulder provided significant relief, but her left shoulder had limited
range of motion.  Alexandra C. was not interested in starting any new medications at that
time.  (Id.)  Plaintiff received a lumbar epidural steroid injection on June 19, 2017.  (Id. at
625.)  Shortly thereafter, on June 27, 2017, she described her back and shoulder pain as
mild and stated she was doing well with occasional medication.  (Id. at 627.)

On July 14, 2017, Nurse Practitioner Romero of the rheumatologist's office
provided a status review of Plaintiff's symptoms.  (Id. at 569.)  Plaintiff denied any recent
arthritic flares and did not exhibit any synovitis upon examination.  (Id.)  She was
attending physical therapy twice per week for her left shoulder at Dr. Eves' referral.  (Id.)
She was seeing a pain management specialist for her cervical degenerative disc disease.
(Id.)  She had recently had a lumbar epidural for her lumbar pain.  (Id.)  Her right
shoulder pain had been resolved with a local steroid injection.  (Id.)  She was to start
using Pennsaid, a topical nonsteroidal anti-inflammatory drug, to be applied as needed for
pain.  (Id.)  Several months later, on October 5, 2017, Plaintiff reported to the nurse
practitioner that physical therapy had provided significant relief to her left shoulder.  (Id.
at 565.)  She had occasional mild low back pain that was aggravated by strenuous
activities and bending, and relieved by rest.  (Id.)  She requested a referral for physical
therapy for her lower back because she felt that her symptoms improved with exercise.
(Id. at 566.)  She stated that she took Tylenol only when the pain was severe.  (Id.)  The

nurse advised Alexandra C. to continue exercising and stretching and discussed a healthy lifestyle through proper diet with Plaintiff.  (Id. at 565.)

Plaintiff had twelve physical therapy appointments at San Diego Spine and Sport between October 16 and December 15, 2017, for her low back.  (Id. at 649, 708-57.)  At her last appointment, she stated that therapy had helped, but she continued to have difficulties depending on the day.  (Id. at 753.)  She did not have pain on some days, but that on others, it was hard to perform house chores, walk, or stand.  (Id.)  She obtained a new physical therapy prescription for her shoulder pain, and attended six sessions between December 21, 2017, and January 18, 2018.  (Id. at 753, 758-81.)  Dr. Eves indicated on December 1, 2017, that Plaintiff should continue her physical therapy exercises.  (Id. at 597-98.)  When Dr. Roldan saw Plaintiff on February 27, 2018, he noted that she still had shoulder pain and tenderness, as well as tenderness in her lumbar spine.  (Id. at 787-88.)

On March 9, 2018, Dr. Roldan completed a questionnaire regarding Alexandra C.'s impairments.  (Id. at 783-86.)  His diagnoses consisted of impingement of both shoulders, rheumatoid arthritis, degenerative disc disease of the lumbar spine, and chronic pain.  (Id. at 783.)  The physician stated that Plaintiff could walk less than one block without rest or severe pain, could sit for only five minutes before needing to get up, and could stand for only five minutes at a time before needing to sit down or walk around.  (Id. at 784.)  He indicated that Plaintiff could sit, stand, and/or walk for less than two hours out of an eight-hour workday.  (Id.)  He estimated that she would need to take unscheduled breaks every thirty minutes.  (Id. at 785.)  Dr. Roldan further opined that Alexandra C. could rarely lift and carry under ten pounds and could never carry ten pounds or more.  (Id.)  He stated that Plaintiff could never twist, stoop, crouch, climb ladders, or climb stairs, and would have significant limitations with reaching, handling, or fingering.  (Id.)  Finally, he stated that she was incapable of even "low stress" work and that due to impairments,

1  Plaintiff did not experience "good days" and "bad days," but rather "all bad" days.  (Id. at

2  786.)

3  **B.**   **Hearing Testimony**

4          On March 22, 2018, Alexandra C. appeared with her attorney at a hearing before

5  ALJ Treblin.  (Id. at 37.)  An interpreter was also present.  (Id.)[8]  Plaintiff testified that

6  she was fifty-six years old and had completed two years of junior college.  (Id. at 38.)

7  She had driven herself to the hearing.  (Id. at 39.)  Plaintiff stated that she spoke some

8  English and read only "[a] little" in English.  (Id. at 37, 39.)  She had, however, taken

9  classes in English at Southwestern College and Mesa College and performed well

10 academically.  (Id. at 39-40.)  Alexandra C. stated that she had problems with her

11 shoulders, back, legs, and feet and had rheumatoid arthritis.  (Id. at 40.)  She testified that

12 she was right-handed and had difficulty reaching with her arms over her head.  (Id. at 40-

13 41.)  She stated that she could lift ten pounds, sit for five to fifteen minutes before

14 needing to get up, and stand or walk for five to ten minutes.  (Id. at 41.)  The doctor who

15 performed her previous back surgery told her that he would perform another surgery in

16 six to eight years.  (Id.)  The doctor who evaluated her shoulder gave her a

17 hydrocortisone injection, sent her to physical therapy, and told her to wait for surgery.

18 (Id. at 42.)  Alexandra C. stated that the injection and physical therapy helped her pain,

19 but medicine did not.  (Id.)  She did not experience any side effects from her medications.

20 (Id.)  During the day, she tried to clean her house and do "the minimum that needs to be

21 done."  (Id.)  She testified that she had pain on an almost daily basis.  (Id. at 43.)

22 Although she was previously unable to lift her arms and hands, she was able to do so

23

24

25 _____

26 [8] The ALJ noted that Plaintiff answered questions posed in English before they were translated from
   English to Spanish.  (Admin. R. 25, ECF No. 8.)

27                                                      12

28                                                                                        19cv0756-RBB

1  after her shoulder injections.  (Id.)  The effects of the injections lasted about three to four

2  months.  (Id. at 43-44.)

3  **C.    ALJ's Decision**

4          On April 25, 2018, the ALJ issued a decision finding that Alexandra C. had not

5  been under a disability, as defined in the Social Security Act, from her alleged onset date

6  through the date of the decision.  (Id. at 21-30.)  Judge Treblin stated that Plaintiff met

7  the insured status requirements of the Social Security Act through December 31, 2019.

8  (Id. at 23.)  He also determined that Plaintiff had not engaged in substantial gainful

9  activity since November 14, 2014, the alleged onset date.  (Id.)  The ALJ found that

10  Alexandra C. had the following severe impairments:  lumbar spine degenerative disc

11  disease; spondylosis status-post history of laminectomy in 2007; cervical spine

12  spondylosis; rheumatoid arthritis with mild symptoms of arthralgias; osteoarthritis;

13  bilateral shoulder impingement with improvement after cortisone injections; and chronic

14  pain.  (Id.)  The ALJ considered Plaintiff's obesity to not be severe because there was no

15  evidence that she experienced limitations due to her weight.  (Id. at 24.)  The ALJ found

16  that, singly or in combination, Plaintiff did not have impairments that met or medically

17  equaled a listing.  (Id.)  He further determined that Alexandra C. had the residual

18  functional capacity to perform medium work except she is able to lift and/or carry fifty

19  pounds occasionally and twenty-five pounds frequently; she is able to sit for six hours in

20  an eight-hour workday with normal breaks; she is able to stand and/or walk for six hours

21  in an eight-hour workday with normal breaks; she has push and/or pull limitations that

22  are the same as the lift and/or carry limitations; she is frequently able to climb ramps,

23  stairs, ladders, ropes, and scaffolds; and she can frequently balance, stoop, kneel, crouch,

24  and crawl.  (Id.)  The ALJ concluded that Plaintiff could perform her past relevant work

25  as a secretary/office worker and waitress and had not been under a disability from

26  November 14, 2014, through the date of his decision.  (Id. at 29.)

27

28

13

19cv0756-RBB

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## II.   LEGAL STANDARDS

Sections 405(g) and 421(d) of the Social Security Act allow unsuccessful applicants to seek judicial review of a final agency decision of the Commissioner.  42 U.S.C.A. §§ 405(g), 421(d) (West 2011).  The scope of judicial review is limited, however, and the denial of benefits "'will be disturbed only if it is not supported by substantial evidence or is based on legal error.'"  Brawner v. Sec'y of Health & Human Servs., 839 F.2d 432, 433 (9th Cir. 1988) (quoting Green v. Heckler, 803 F.2d 528, 529 (9th Cir. 1986)); see also Garrison v. Colvin, 759 F.3d 995, 1009 (9th Cir. 2014). Substantial evidence means "'more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Sandgathe v. Chater, 108 F.3d 978, 980 (9th Cir. 1997) (quoting Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995)).  The court must consider the entire record, including the evidence that supports and detracts from the Commissioner's conclusions.  Desrosiers v. Sec'y of Health & Human Servs., 846 F.2d 573, 576 (9th Cir. 1988).  If the evidence supports more than one rational interpretation, the court must uphold the ALJ's decision.  Allen v. Heckler, 749 F.2d 577, 579 (9th Cir. 1984).  The district court may affirm, modify, or reverse the Commissioner's decision.  42 U.S.C.A. § 405(g).  The matter may also be remanded to the SSA for further proceedings.  Id.

To qualify for disability benefits under the Social Security Act, a claimant must show two things:  (1) The applicant suffers from a medically determinable impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of twelve months or more; and (2) the impairment renders the applicant incapable of performing the work that he or she previously performed or any other substantially gainful employment that exists in the national economy.  See 42 U.S.C.A. §§ 423(d)(1)(A), (2)(A) (West 2011).  An applicant must meet both requirements to be classified as "disabled."  Id.  The applicant bears the burden of

1    proving he or she was either permanently disabled or subject to a condition which

2    became so severe as to disable the applicant prior to the date upon which his or her

3    disability insured status expired.  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).

4        The Commissioner makes this assessment by employing a five-step analysis

5    outlined in 20 C.F.R. § 404.1520.  See also Tackett v. Apfel, 180 F.3d 1094, 1098-99

6    (9th Cir. 1999) (describing five steps).  First, the Commissioner determines whether a

7    claimant is engaged in "substantial gainful activity."  If so, the claimant is not disabled.

8    20 C.F.R. § 404.1520(b) (2019).  Second, the Commissioner determines whether the

9    claimant has a "severe impairment or combination of impairments" that significantly

10   limits the claimant's physical or mental ability to do basic work activities.  If not, the

11   claimant is not disabled.  Id. § 404.1520(c).  Third, the medical evidence of the claimant's

12   impairment is compared to a list of impairments that are presumed severe enough to

13   preclude work; if the claimant's impairment meets or equals one of the listed

14   impairments, benefits are awarded.  Id. § 404.1520(d).  If not, the claimant's residual

15   functional capacity is assessed and the evaluation proceeds to step four.  Id.

16   § 404.1520(e).  Fourth, the Commissioner determines whether the claimant can do his or

17   her past relevant work.  If the claimant can do their past work, benefits are denied.  Id.

18   § 404.1520(f).  If the claimant cannot perform his or her past relevant work, the burden

19   shifts to the Commissioner.  In step five, the Commissioner must establish that the

20   claimant can perform other work.  Id. § 404.1520(g).  If the Commissioner meets this

21   burden and proves that the claimant is able to perform other work that exists in the

22   national economy, benefits are denied.  Id.

### III.    DISCUSSION

24       Plaintiff argues that the ALJ's decision is not supported by substantial evidence

25   because the ALJ did not properly consider her subjective complaints, failed to properly

26   evaluate the opinion of her treating physician, Dr. Roldan, and improperly found that

27

28

15

1  Plaintiff is fully literate in English.  (Pl.'s Mot. Attach. #1 Mem. Supp. Summ. J. 10-15,

2  ECF No. 10.)

3  **A.    Subjective Complaints**

4      Plaintiff first contends that the ALJ failed to articulate clear and convincing

5  reasons to reject her subjective complaints.  (Id. at 10-13.)  It is her view that the ALJ

6  considered only one factor, Plaintiff's daily activities, in evaluating her symptom

7  testimony.  (Id. at 13.)  In response, Defendant argues that the ALJ in fact provided four

8  reasons for finding that Plaintiff's testimony was not entirely consistent with the record:

9  his own observations of Plaintiff at the administrative hearing, her relatively benign exam

10 findings throughout the medical record, her conservative treatment to relatively good

11 effect, and evidence of her daily activities.  (Def.'s Mot. Attach. #1 Mem. Supp. Summ. J.

12 4-8, ECF No. 17.)

13     An ALJ engages in a two-step analysis to determine the extent to which a

14 claimant's report of symptoms must be credited.  First, an ALJ must determine whether

15 the claimant has presented objective medical evidence of an underlying impairment

16 which could reasonably be expected to produce the pain or other symptoms alleged.

17 Trevizo v. Berryhill, 871 F.3d 664, 678 (9th Cir. 2017) (citing Garrison, 759 F.3d at

18 1014-15).  In this analysis, the claimant is not required to show that her impairment could

19 reasonably be expected to cause the severity of the symptoms alleged; nor is she required

20 to produce objective evidence of the pain or its severity.  Id. (citing Garrison, 759 F.3d at

21 1014-15).  If the claimant satisfies step one of the analysis, and there is no evidence of

22 malingering, the ALJ can reject the claimant's testimony about the severity of her

23 symptoms only by offering "specific, clear and convincing reasons" for doing so.  Id.

24     Here, ALJ Treblin determined that Alexandra C. satisfied step one of the two-step

25 analysis.  (Admin. R. 25, ECF No. 8.)  Nevertheless, he found Plaintiff's allegations of

26 debilitating symptoms were "not entirely consistent with the medical evidence and other

27

28

16

1  evidence in the record."  (Id.)  As Defendant observes, he articulated four reasons for his
2  finding.

3       **1.     ALJ's observations of Plaintiff at the administrative hearing**

4       First, the ALJ relied on his observations of Plaintiff at the administrative hearing in
5  his consideration of her subjective symptom testimony.  He noted that Alexandra C.
6  answered questions posed in English before they were translated from English to
7  Spanish.  (Id.; see also id. at 37 (ALJ's observation during the hearing that Plaintiff
8  "obviously" spoke some English).)  The ALJ also commented that notwithstanding her
9  testimony that she could speak and understand only a little English and could not read or
10  write in English, Plaintiff had attended two years of community college classes, including
11  English classes, and by her own admission she had received good grades in college.  (Id.
12  at 25.)

13       An ALJ may consider his or her observations of a claimant at the administrative
14  hearing when assessing the claimant's subjective statements.  See 20 C.F.R. §
15  404.1529(c)(3) ("We will consider all of the evidence presented, including . . .
16  "observations by our employees and other persons.").  But according to Social Security
17  Ruling ("SSR") 16-3p, the ALJ must limit his evaluation of a claimant's symptoms to
18  "the evidence in the record that is relevant to the individual's impairments."  SSR 16-3p,
19  2017 WL 5180304, at *11 (Oct. 25, 2017).[9]  "The focus of the evaluation of an
20  individual's symptoms should not be to determine whether he or she is a truthful person."
21  Id. at *11.  The ALJ's observation of Plaintiff's ability to communicate in English is not

22

23  _____

24  [9] SSR 16-3p supersedes SSR 96-7p, the previous policy governing the evaluation of subjective
25  symptoms, and applies to decisions rendered after March 28, 2016.  SSR 16-3p, 2017 WL 5180304, at
   *1-*2.  The Ninth Circuit stated that SSR 16-3p "makes clear what our precedent already required: that
26  assessments of an individual's testimony by an ALJ are designed to 'evaluate the intensity and
   persistence of symptoms . . .' and not to delve into wide-ranging scrutiny of the claimant's character and
27  apparent truthfulness."  Trevizo v. Berryhill, 871 F.3d 664, 678 n.5 (9th Cir. 2017) (citing SSR 16-3p).

28

relevant to her impairments but rather appears to be an assessment of her veracity, and thus it does not constitute a clear and convincing reason to reject her pain testimony.

### 2.    Benign exam findings

Second, Judge Treblin noted that Alexandra C. had relatively normal exam findings throughout the medical record.  (Admin. R. 25, ECF No. 8.)  Although an ALJ may not disregard a claimant's testimony "solely because it is not substantiated affirmatively by objective medical evidence," (see Robbins v. Soc. Sec. Admin., 466 F.3d 880, 883 (9th Cir. 2006)), the ALJ may consider whether the alleged symptoms are consistent with the medical evidence as one factor in his evaluation.  See Lingenfelter v. Astrue, 504 F.3d 1028, 1040 (9th Cir. 2007).  In this case, the ALJ referred to medical evidence in the record to demonstrate that many of Plaintiff's examinations yielded normal or benign results, including Dr. Barba's "normal neurologic exam" on July 8, 2013 (see Admin. R. 222, ECF No. 8); an essentially normal examination by nurse practitioner Lazarek on January 26, 2015 (id. at 296-97); an overall normal evaluation except for lumbar spine tenderness by Dr. Roldan on November 4, 2015 (id. at 309); an essentially normal physical exam on May 17, 2006,[10] by Dr. Al Nahlawi (id. at 446); Dr. Busa's normal physical and neurological exam on March 10, 2017 (id. at 433-34); and Nurse Practitioner Romero's examination on May 12, 2017, in which no active synovitis was noted (id. at 554).  (See id. at 26-27.)

The ALJ's observation that Plaintiff often presented with unremarkable findings on physical exam is supported by substantial evidence in the record.  As the ALJ observed, although Alexandra C. had undergone back surgery in the past and her recent MRI scans showed cervical and lumbar conditions, "she had mostly normal physical exams except

---

[10] The ALJ erroneously indicated the date of this examination as June 14, 2016.  (Compare Admin. R. 27, ECF No. 8, with id. at 445-46.)

19cv0756-RBB

1  for spinal and shoulder tenderness." (Id. at 25.)  In addition to the normal examinations

2  referred to by the ALJ in his decision, the record contains other evidence of relatively

3  normal medical evaluations.  (See, e.g., id. at 402 (normal range of motion in all joints,

4  normal low back flexion, and normal neurological exam); 521 (normal range of motion of

5  neck without pain).)  ALJ Treblin's observation that Plaintiff had been diagnosed with

6  rheumatoid arthritis but only had "mild" symptoms is also supported by the substantial

7  evidence.  (See, e.g., id. at 253 (no signs of active synovitis); 297 (normal joint exam);

8  381 (no clinical presentation suggesting an inflammatory joint disease); 402 (rheumatoid

9  arthritis doubtful); 431 (no evidence of active rheumatoid arthritis); 446 (no tenderness or

10 synovitis, and normal movement of all extremities).)  And, although Plaintiff was treated

11 for osteoarthritis, x-rays showed only mild osteoarthritis in her fingers and toes.  (Id. at

12 349-50.)

13      The Court finds that Plaintiff's relatively benign findings on examination

14 constituted a clear and convincing reason for the ALJ to discount her testimony regarding

15 the severity of her symptoms.

16      **3.    Conservative medical treatment**

17      The ALJ's third reason for discrediting Plaintiff's pain testimony was that she

18 engaged in only conservative medical treatment.  Receiving only "minimal, conservative

19 treatment" is a valid reason to discredit a claimant's symptom testimony.  Meanel v.

20 Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999); see also Parra v. Astrue, 481 F.3d 742, 751

21 (9th Cir. 2007); 20 C.F.R. § 404.1529(c)(3)(v) (treatment received for relief of pain

22 relevant to evaluating symptoms).  Plaintiff's medical providers consistently prescribed

23 conservative treatment consisting of physical therapy, exercises, and steroid injections.

24 After reviewing her lumbar MRI scans, Dr. Barba, a neurosurgeon, advised against

25 surgical intervention and recommended only physical therapy and an exercise bike.

26 (Admin. R. 245, ECF No. 8.)  Dr. Al Nahlawi, a rheumatologist, referred Plaintiff to

27

28

1   physical therapy for her shoulder complaints.  (Id. at 289.)  Dr. Pazirandeh, another

2   rheumatologist, referred Alexandra C. to physical therapy and instructed her on shoulder

3   exercises.  (Id. at 406, 443.)  Pain specialist Dr. Lutfy recommended physical therapy,

4   epidural steroid injections, myofascial treatments, exercise, and postural corrections.  (Id.

5   at 619-20.)  Physical therapy and exercise are conservative treatment measures.  See, e.g.,

6   Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008) (finding conservative course

7   of treatment includes physical therapy).  Although courts have characterized steroid

8   epidural injections as both conservative and not conservative, in instances of limited

9   injections, they may be considered conservative.  See Ruiz v. Berryhill, 2017 WL

10  4570811, at *5 (C.D. Cal. Oct. 11, 2017) (collecting cases); Jones v. Comm'r of Soc. Sec.

11  Admin., 2014 WL 228590, at *7 (E.D. Cal. Jan. 21, 2014) (finding occasional use of

12  epidural injections in conjunction with anti-inflammatory medications may be considered

13  conservative).

14       In assessing a claimant's subjective symptoms, an ALJ may also properly consider

15  whether the claimant had a "fair response" to treatment.  See Odle v. Heckler, 707 F.2d

16  439, 440 (9th Cir. 1983); see also 20 C.F.R. § 404.1529(c)(3)(v).  In this case, the

17  conservative treatment prescribed by Plaintiff's physicians generally helped her

18  symptoms.  After completing a course of physical therapy, Alexandra C. reported that she

19  had not experienced pain in a week and her pain level was only between zero and two.

20  (Admin. R. 497, ECF No. 8; see also id. at 565 (treatment record indicating that physical

21  therapy had "provided significant relief".)  Steroid injections also helped to improve

22  Plaintiff's symptoms.  (See id. at 557 (doctor's note that injection to right shoulder helped

23  for three months; 43-44 (Plaintiff's testimony that effects of shoulder injections lasted for

24  three to four months).)  Plaintiff acknowledged that exercise helped to decrease her pain.

25  (See id. at 566 (treatment note stating that Plaintiff "noticed [her] symptoms have

26  improved with exercise").)

27

28

1    The ALJ's third reason for discounting Plaintiff's pain testimony is clear and

2    convincing.

3    ### 4.    Daily activities

4    Fourth, ALJ Treblin reviewed the evidence of Alexandra C.'s daily activities and

5    found them inconsistent with her allegations of disabling symptoms.  Specifically, he

6    referred to a notation in the medical record indicating that she drove independently and

7    exercised three times a week at a one-hour long aquatics class.  (Id. at 27 (citing id. at

8    370).)  Plaintiff contends that her daily activities do not support a finding that she can

9    stand or walk for more than her claimed limitations.  (Pl.'s Mot. Attach. #1 Mem. Supp.

10   Summ. J. 13, ECF No. 10.)

11   An ALJ may properly consider the claimant's daily activities in evaluating

12   testimony regarding subjective pain.  See, e.g., Thomas v. Barnhart, 278 F.3d 947, 958-

13   59 (9th Cir. 2002); see also 20 C.F.R. § 404.1529(c)(3)(i) (claimant's daily activities

14   relevant to evaluating symptoms).  The ALJ may consider inconsistencies between the

15   claimant's testimony and the claimant's conduct, as well as whether the claimant engages

16   in activities inconsistent with the alleged symptoms.  Molina v. Astrue, 674 F.3d 1104,

17   1112 (9th Cir. 2012) (quotations and citations omitted).  "One does not need to be 'utterly

18   incapacitated' in order to be disabled."  Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir.

19   2001) (citing Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)).  Nevertheless, "[e]ven

20   where [a claimant's] activities suggest some difficulty functioning, they may be grounds

21   for discrediting the claimant's testimony to the extent that they contradict claims of a

22   totally debilitating impairment."  Molina, 674 F.3d at 1113 (citations omitted).

23   Here, the ALJ found that Plaintiff's claimed limitations, including being able to

24   stand or walk for only five to ten minutes, sit for five to fifteen minutes, and lift only ten

25   pounds, were inconsistent with her ability to drive independently and exercise at the gym.

26   The ALJ could reasonably conclude that Alexandra C.'s activities undermined her

27

28

testimony that she was incapable of standing, walking, or sitting for more than a few minutes at a time.  In addition to driving independently and doing aquatics exercise classes at the gym, Plaintiff was able to clean her house, including vacuuming and mopping, and could use the treadmill and exercise bike at the gym for thirty minutes. (See Admin. R. 309, 497, 499, ECF No. 8.)  Plaintiff's daily activities constituted a clear and convincing reason to discredit her testimony regarding the functional limitations caused by her symptoms.

The Court concludes that the ALJ articulated sufficient specific, clear and convincing reasons supported by substantial evidence to discount Plaintiff's subjective symptom testimony.

**B.    <u>Treating Physician Opinion</u>**

Plaintiff next argues that the ALJ failed to properly consider the opinion of her treating primary care physician, Dr. Roldan.  (Pl.'s Mot. Attach. #1 Mem. Supp. Summ. J. 13-14, ECF No. 10.)  As set forth above, Dr. Roldan stated that Plaintiff could walk less than one block, sit for five minutes, and stand for only five minutes at a time. (Admin. R. 784, ECF No. 10.)  He indicated that Plaintiff could sit, stand, and/or walk for less than two hours out of an eight-hour workday, and she would need to take unscheduled breaks every thirty minutes.  (Id. at 784-85.)  He further opined that Alexandra C. could rarely lift and carry up to ten pounds and could never carry ten pounds or more.  (Id. at 785.)  He found that she would have significant limitations reaching, handling, or fingering, and was incapable of even "low stress" work.  (Id. at 785-86.)  Defendant contends that the ALJ reasonably found that Dr. Roldan's opinions regarding Plaintiff's limitations were inconsistent with the doctor's treatment records. (Def.'s Mot. Attach. #1 Mem. Supp. Summ. J. 8-9, ECF No. 17.)  Defendant further argues that the ALJ was entitled to give little weight to Dr. Roldan's opinion that Plaintiff

22

1    was "completely disabled" and to rely upon the opinions of the state agency physicians.

2    (Id. at 9.)

3           The standard for determining whether an ALJ properly rejected the opinion of a

4    treating physician varies.  If the treating doctor's opinion is not contradicted by another

5    physician, the ALJ must give clear and convincing reasons for rejecting it.  Thomas, 278

6    F.3d at 957.  On the other hand, if the treating physician's opinion is contradicted, "the

7    ALJ must give specific, legitimate reasons for disregarding the opinion of the treating

8    physician.'"  Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1195 (9th Cir. 2004)

9    (quoting Matney v. Sullivan, 981 F.2d 1016, 1019 (9th Cir. 1992)); see also Orn v.

10   Astrue, 495 F.3d 625, 632 (9th Cir. 2007).  An ALJ may discredit opinions "that are

11   conclusory, brief, and unsupported by the record as a whole . . . or by objective medical

12   findings."  Batson, 359 F.3d at 1195 (citing Tonapetyan v. Halter, 242 F.3d 1144, 1149

13   (9th Cir. 2001)).  Generally, more weight is given to the opinions of treating physicians

14   because they "are likely to be the medical professionals most able to provide a detailed,

15   longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique

16   perspective to the medical evidence that cannot be obtained from the objective medical

17   findings alone or from reports of individual examinations, such as consultative

18   examinations or brief hospitalizations."  20 C.F.R. §§ 404.1527(c)(2).[11]  But if a treating

19   physician's opinion is not supported by the record, it may be disregarded.  Batson, 359

20   F.3d at 1195; see also Morgan v. Comm'r of Soc. Sec. Admin., 169 F.3d 595, 600 (9th

21

22

23

24   [11] For claims filed on or after March 27, 2017, adjudicators will no longer give any specific evidentiary
     weight, including controlling weight, to any medical opinions.  20 C.F.R. § 404.1520c(a).  Instead, the
25   adjudicator will evaluate the persuasiveness of the medical opinion using factors including
     supportability, consistency, relationship with the claimant, and specialization.  Id. § 404.1520c(c).  For
26   claims filed before March 27, 2017, including Plaintiff's claim, the rules in section 404.1527 apply.  Id.
27   § 404.1527.

                                                      23

28                                                                              19cv0756-RBB

Cir. 1999) (holding that "the opinion of the treating physician is not necessarily conclusive as to either the physical condition or the ultimate issue of disability[]").

Dr. Roldan's opinion was contradicted by other medical opinions in the record, those of Dr. Steinsapir and Dr. Wafer, the state agency physicians, who determined that Plaintiff was able lift and carry fifty pounds occasionally and twenty-five pounds frequently, stand and/or walk for six hours in an eight-hour day, sit for six hours in an eight-hour day, and was unlimited in her ability to push and/or pull. (Admin. R. 54-55, 66-67, ECF No. 8.) Thus, the ALJ was required to articulate specific and legitimate reasons to reject the treating physician's opinion that were based on substantial evidence in the record. Batson, 359 F.3d at 1195. In providing specific and legitimate reasons to reject a treating physician's opinion, an ALJ should set out "a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings." Garrison, 759 F.3d at 1012 (quotations and citation omitted).

The ALJ did so here. He set forth a thorough review of the medical record and found that Dr. Roldan's[12] assertions of disability, which he also made in his treatment notes dated April 12, 2017, September 22, 2017, and February 27, 2018, were not consistent with his treatment records. (See Admin. R. 28, ECF No. 8 (citing id. at 500-01, 607-608, 787-88).) On November 4, 2015, for example, Dr. Roldan wrote that Alexandra C. was completely disabled and could not perform activities of daily living, yet his clinical notes from the same day indicated that Plaintiff engaged in activities of daily living unimpaired and had a normal exam other than lumbar spine tenderness in paravertebral muscles. (Id. at 28 (citing id. at 308-09).) The ALJ also found that Dr. Roldan's opinion that Plaintiff was disabled was inconsistent with the evaluations by Dr. Busa and Dr. Eves. (Id. at 28.) On March 10, 2017, Dr. Busa, a rheumatologist,

---

[12] The ALJ mistakenly refers to Dr. Roldan as "Dr. Anselmo." Anselmo is Dr. Roldan's first name.

1   indicated that Alexandra C.'s joints showed no synovitis and all joints had full range of

2   motion, other than her left shoulder.  (Id. at 28, (citing id. at 434).)  Dr. Eves, the

3   orthopedic surgeon, evaluated Plaintiff on December 1, 2017, and recommended that she

4   continue with conservative treatment measures.  (Id. at 28 (citing id. at 597-98).)  The

5   ALJ could appropriately find that these evaluations undermined Dr. Roldan's opinion.

6   The treating doctor's restrictive assessment of Plaintiff's functional capacity and

7   statement that she experienced "all bad days," (see id. at 786), are also inconsistent with

8   other evidence in the record.  On October 5, 2017, Alexandra C. said that she only had

9   mild low back pain when she engaged in strenuous activities and that she needed Tylenol

10  only when her pain was severe.  (Id. at 565.)  On December 15, 2017, Plaintiff explicitly

11  stated that she did not have any pain on some days but had difficulties on others.  (Id. at

12  753.)

13          Opinions of nonexamining medical advisors may serve as substantial evidence

14  when they are supported by other evidence in the record and are consistent with it.

15  Morgan, 169 F.3d at 600 (citation omitted).  Here, the ALJ gave "great weight" to the

16  opinions of Drs. Steinsapir and Wafer.  (Admin. R. 29, ECF No. 8.)  Courts have

17  consistently upheld an ALJ's rejection of the opinion of a treating physician based in part

18  on the testimony of a nonexamining medical advisor.  Morgan, 169 F.3d at 602; see also

19  Allen, 749 F.2d at 579 (stating that when there is conflicting medical evidence, it is

20  within the ALJ's purview to "determine credibility and resolve the conflict.").  If the

21  evidence supports more than one rational interpretation, the court must uphold the ALJ's

22  decision.  Id.

23          The Court finds the ALJ's rejection of Dr. Roldan's opinion was sufficiently

24  specific and legitimate and supported by substantial evidence in the record.

25  / / /

26  / / /

27

28

1

## C.   English Literacy

2      Plaintiff's final argument is that the ALJ's finding that Plaintiff is "not illiterate in
3 English and is fully able to communicate in English" is not supported by substantial
4 evidence in the record.  (Pl.'s Mot. Attach. #1 Mem. Supp. Summ. J. 14-15, ECF No. 10.)
5 She appears to argue that testimony should have been obtained from a vocational expert
6 in light of her "limited ability to speak English."  (Id. at 14.)  In response, Defendant
7 contends that Plaintiff's argument that "she lacked the English skills to perform work that
8 she had already performed for over sixteen (16) years is without merit and wholly
9 illogical."  (Def.'s Mot. Attach. #1 Mem. Supp. Summ. J. 10, ECF No. 17.)

10      Again, substantial evidence means "'more than a mere scintilla but less than a
11 preponderance; it is such relevant evidence as a reasonable mind might accept as
12 adequate to support a conclusion.'"  Sandgathe, 108 F.3d at 980 (9th Cir. 1997) (quoting
13 Andrews, 53 F.3d at 1039).  As discussed earlier, the ALJ personally observed that
14 Plaintiff was able to answer questions posed in English at the administrative hearing.
15 (Admin. R. 25, 37, ECF No. 8.)  Furthermore, "[Alexandra C.] answered questions posed
16 in English before they were translated from English to Spanish."  (Id. at 25.)  Plaintiff
17 testified that she attended two years of junior college in the United States, took classes in
18 English, and received good grades.  (Id. at 38, 40.)  Also, in a disability report submitted
19 to the SSA, Plaintiff indicated that she cannot speak and understand English, but she can
20 read and understand English.  (Id. at 163.)  Substantial evidence supports the ALJ's
21 determination that Plaintiff was not illiterate in English and was able to fully
22 communicate in English.

23 / / /

24 / / /

25 / / /

26 / / /

27

28

19cv0756-RBB

### III.   CONCLUSION

For the reasons stated above, Plaintiff's motion for summary judgment, reversal or remand is **DENIED** and Defendant's cross-motion for summary judgment is **GRANTED**.

This Order concludes the litigation in this matter.  The Clerk shall close the file.

**IT IS SO ORDERED**.

Dated:  April 29, 2020

Hon. Ruben B. Brooks
United States Magistrate Judge

27

19cv0756-RBB